UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DANA NOAKES

      Plaintiff,

   v.

                                    Case Number: 2:22-CV-00213

ALEJANDRO N. MAYORKAS
Secretary, United States Department
of Homeland Security, *in his official
capacity,*

REGINALD CHESTERFIELD
Senior Transportation Security
Manager, *in his official capacity,*

      Defendants.

## COMPLAINT AND JURY DEMAND

The Transportation Security Administration at Louis Armstrong New Orleans International Airport is discriminating against a white employee on the basis of race. Plaintiff Dana Noakes is a career-long Transportation Security Officer employed by TSA. Ms. Noakes holds a supervisory position and has never been disciplined. Despite her pristine record, she was dragged through an unconstitutional disciplinary process and was subjected to a severe and pervasive hostile work environment based on her race, first by her peers, then by TSA management. To make matters worse, TSA also threatened Ms. Noakes with sanctions should she continue to exercise her free speech rights and has retaliated against her for protected conduct. Accordingly, TSA is

1

violating federal law, specifically Title VII and the First Amendment. In support of her Complaint, Ms. Noakes alleges as follows:

PARTIES AND JURISDICTION

1. Plaintiff Dana Noakes is domiciled in Louisiana and is an employee of the United States Transportation Security Administration ("TSA") at Louis Armstrong International Airport ("MSY") in New Orleans, Louisiana.

2. Defendant Secretary Mayorkas is the Secretary for the United States Department of Homeland Security and is the proper defendant for Title VII claims against the TSA, and is sued here solely in his official capacity for all available relief.

3. Defendant Reginald Chesterfield is domiciled in Louisiana, resides in this judicial district, and is sued solely in his official capacity as an employee of the Transportation Security Administration. Defendant Chesterfield is a Senior Transportation Security Manager and is sued solely for declaratory and prospective, injunctive relief.

4. This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because all the claims in this lawsuit arise under the laws of the United States and the United States Constitution.

5. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because this suit is brought in a judicial district within the state in which the unlawful employment practice was committed.

6. Personal jurisdiction is proper in this Court because Defendant Mayorkas is an official of the United States government and is sued in his official capacity; and

2

because Defendant Chesterfield is domiciled in Louisiana, resides in this judicial district, and is sued solely in his official capacity as an employee of the TSA.

## FACTS COMMON TO ALL CLAIMS

### Background of the Parties

7. Ms. Noakes has been employed by the TSA at MSY for over thirteen years and has spent the past six years as a Supervisory Transportation Security Officer ("STSO"). In her tenure as STSO, Ms. Noakes has never been disciplined and has not had any grievance complaints filed against her. Ms. Noakes is a white female.

8. An STSO is an officer entrusted with supervisory duties and authorities over TSA employees and agents. STSOs, however, are subordinate to management-level agents of TSA. Such higher-level employees and agents wield significant power over STSOs. This power includes the ability to reassign STSOs to different stations, to promote or not promote STSOs, and to place STSOs on involuntary leave.

9. In June of 2020, while off duty, Ms. Noakes made comments about some of the global protests and riots on her private Facebook page, specifically criticizing a video of a group of white rioters in the United Kingdom.

10. Ms. Noakes does not identify herself as a TSA employee or representative on any of her social media profiles, including Facebook.

11. Likewise, she did not identify herself as a TSA employee or representative on any of the subject Facebook posts.

12. In the days between June 17, 2020 and July 3, 2020, several of Ms. Noakes's coworkers responded to her free speech by harassing her. Specifically, her coworkers

3

took screenshots of her comments and her profile picture and identified her as a TSA Supervisor at the New Orleans Airport.

13. These coworkers also edited portions of Ms. Noakes's comments out of their screenshots in order to defame her as a racist.

14. They also shared her picture, work information, and work location in a private Facebook group called the "TSA Breakroom," all without Ms. Noakes's permission.

15. TSA Breakroom consists of over 18,000 current and past TSA employees. Ms. Noakes has never been a member of this group.

16. Many coworkers also shared her personal information on their personal pages.

17. This harassment, including threats made against her, was first brought to Ms. Noakes's attention by a fellow STSO, who is a member of the TSA Breakroom group and was concerned for Ms. Noakes's physical safety. The comments were so hostile and threatening in nature that Ms. Noakes became fearful for her family's safety as well as her own.

18. In order to de-escalate the situation, Ms. Noakes immediately deleted her posts regarding the rioters. Because the coworkers had taken screenshots of the posts and shared them along with Ms. Noakes's personal identifiable information, the damage was already done. Her coworkers continued to share her posts and information on the internet without her consent with the intent to harm Ms. Noakes psychologically, if not physically.

19. Many of the coworkers who participated in the harassment of Ms. Noakes are non-white.

**TSA Fails to Address the Harassment**

20.    On June 18, 2020, Ms. Noakes notified the TSA Anti-Harassment Coordinator in Washington, D.C. of the harassment and initiated a complaint of workplace harassment.

21.    On or about June 30, 2020, another non-white coworker created a Facebook post which included Ms. Noakes's name, photo, employer, title, and work location. The post was defamatory and revealed Ms. Noakes's personal information without her consent. This post caused her to become fearful of retaliation by members of the public. It was shared more than 500 times by many coworkers, airport employees, and strangers.

22.    Ms. Noakes's coworkers targeted her because she is white and was critical of the protests and riots that occurred during the summer of 2020.

23.    Ms. Noakes informed TSA's Anti-Harassment Coordinator that this post, and the rapidity with which it was shared, filled her with great fear to be on the TSA checkpoint as well as the entire MSY complex. Specifically, Ms. Noakes became afraid for her physical safety were she to come to work. She raised these concerns with the Anti-Harassment Coordinator.

24.    On or about July 2, 2020, Federal Security Director ("FSD") of Louisiana, Arden Hudson, sent an email to the MSY workforce titled "Letter from the Desk of the FSD."

25.    This letter informed the workforce about unacceptable social media and internet behavior, including TSA's Zero Tolerance Policy. The letter also discussed

cyberbullying, respecting people's privacy, and limitations on "prominently featuring our agency's name, seal, uniform, or other similar items on a social media account, or in connection with specific social media activities or posts."

26.    Despite FSD Hudson's email defining cyberbullying as well as addressing unacceptable social media and internet behavior, TSA took no remedial action at that time, or ever, on Ms. Noakes's harassment complaint.

27.    On July 6, 2020, Ms. Noakes informed TSA management at MSY that the harassment was continuing.

28.    She reiterated her concern for her physical safety and informed management that her personal identifiable information had been disclosed by TSA employees. Ms. Noakes also notified management that two of the harassers had access to her social security number by virtue of their assigned status in their collateral duty timekeeping positions.

29.    Specifically, on June 10, 2021, Ms. Noakes expressed a concern that two of her non-white harassers, Ronite Green and Yolanda Jackson, had access to her personal identifiable information. Ms. Noakes further requested that such access be revoked during the pendency of her harassment complaint. TSA never responded to this request.

30.    On December 23, 2021, TSA indicated in writing to Ms. Noakes that neither Jackson's or Green's access to Ms. Noakes's personal information was revoked, meaning that two of her harassers had access to her social security number and other identifiable information the entire time.

31.   Instead of taking any action, TSA management at MSY merely said that the new information would be "forwarded to Washington to be added to her complaint."

32.   Management did not address any of Ms. Noakes's concerns for her physical safety or take any measures to protect her.

33.   In or around July or August 2020, Ms. Noakes was informed that four "fact-finders" were assigned to investigate her complaint.

34.   On or around August 24, 2020, two months after Ms. Noakes made her complaint of workplace harassment, she notified FSD Hudson that the harassment was ongoing and that her personal identifiable information was still being shared by TSA employees.

35.   FSD Hudson asked for the names of the offending employees. Ms. Noakes gave the names to him.

36.   Still, FSD Hudson took no action against the offending individuals.

37.   Ms. Noakes was informed that the "fact finding" concluded in late September 2020. No decision was made at that time. Ms. Noakes did not receive any further communication regarding her complaint for months.

38.   On or around October 14, 2020, Ms. Noakes contacted FSD Hudson again because the personal identifiable information was still posted on the offenders' Facebook accounts.

39.   FSD Hudson still did not take any action against the offending individuals. In fact, FSD Hudson specifically told Ms. Noakes that he could not take any action against the offending individuals because of a conversation he had with "TSA legal."

40.   "TSA legal" had apparently informed FSD Hudson that he could not discipline the offending employees, who were non-white, because their speech was protected by the First Amendment.

41.   Despite FSD Hudson's statement that no action could be taken on her complaint, Ms. Noakes's complaint against the offending employees remained open for several months with no updates or apparent progress.

42.   TSA policy provides that the full length of an investigation is not to exceed forty-five days.

43.   Here, the investigation concluded on April 14, 2021, nearly ten months after Ms. Noakes's initial complaint of workplace harassment, in clear violation of TSA's own policy.

44.   While her complaint was still pending, Ms. Noakes made several attempts to inquire about the status of her complaint in order to move the process forward. She received no substantive response.

45.   In its conclusion on April 14, 2021, TSA informed Ms. Noakes that it would not take any action against the offending employees. It failed to list several of the most egregious offending employees, including the non-white employees that revealed Ms. Noakes's personal information. Apparently, TSA never investigated those portions of Ms. Noakes's complaint. No explanation was given as to why TSA refused to investigate these employees. The employees it failed to investigate were all non-white.

## TSA Intimidates the Victim of Harassment

46. In a surprising twist of events, on or around March 1, 2021, Ms. Noakes was contacted by her administrative supervisor, Transportation Security Manager Miladin Mutavdzic, to conduct a Pre-Decisional Discussion ("PDD") of an apparent allegation against *her*.

47. Defendant Chesterfield initiated this disciplinary process through his subordinate, Mutavdzic.

48. A PDD is the beginning of the formal disciplinary process at TSA.

49. In this conversation, Mutavdzic advised Ms. Noakes that an allegation was filed against her regarding her June 2020 Facebook posts criticizing rioters and that TSA management was proposing a Letter of Reprimand ("LoR") to address that allegation. This was over eight months after she had made the posts.

50. A LoR is a formal disciplinary measure that remains in an employee's permanent record indefinitely. In contrast, TSA never threatened or recommended a LoR against any non-white offending employee related to Ms. Noakes's complaint of harassment that was also based on social media posts involving free speech.

51. Ms. Noakes was given one week to provide a response to the presented allegation. In violation of TSA policy, no aggravating or mitigating factors were discussed or listed during the PDD.

52. According to TSA policy, during the PDD, Ms. Noakes was entitled to be presented with documents supporting any allegations. She was not provided with any supporting documents; she was only provided the allegation itself.

9

53. It appeared from the allegation that Ms. Noakes obtained during the PDD that a "fact finding" had been conducted approximately 150 days earlier. TSA policy provides that a LoR should be proposed to the accused within 30 days of the conclusion of the "fact finding." This, of course, was another violation.

54. During the PDD, on March 1, 2021, Mutavdzic certified that this allegation was the only pending allegation against Ms. Noakes.

55. A week later, on or around March 8, 2021, Ms. Noakes submitted a timely response to the allegation, arguing that her criticism of white British rioters made on her private Facebook page was protected speech. TSA did not provide any substantive response to Ms. Noakes's arguments.

56. The next day, on March 9, 2021, Mutavdzic informed Ms. Noakes of another allegation ("Allegation #2"), despite previously certifying that there were no other allegations pending. Again, no supporting documents were attached and no aggravating or mitigating factors were listed or discussed. Mutavdzic said he "omitted" Allegation #2 from his original PDD.

57. Any complaint prompting Allegation #2 was made prior to the PDD to discuss the first allegation. Accordingly, Mutavdzic knew about Allegation #2 when he certified that the first allegation was the only pending allegation.

58. Ms. Noakes filed a timely response to Allegation #2 on or around March 14, 2021.

59. Both allegations were clearly pretextual, punishing Ms. Noakes for expressing her free speech on Facebook and then complaining about the harassment she received in response.

60. TSA policy provides that a final decision should be rendered within 21 days of the respondent submitting her response. Over the next eight months, Ms. Noakes repeatedly inquired into the state of the cases against her and was given no substantive response.

61. During this time, one non-white employee indicated on Facebook that she was "waiting on management" for Ms. Noakes to be fired, an obvious reference to Ms. Noakes's two PDDs.

62. TSA did not render any decision regarding either allegation until November 9, 2021 (another violation of TSA's own policy). Rightfully, TSA dismissed the allegations against Ms. Noakes.

63. When TSA finally dismissed the allegations, Defendant Chesterfield stated that the decision to dismiss the cases against her was based upon the fact that there had been "no similar conduct" by Ms. Noakes since June 2020.

64. This statement strongly implies that Defendant Chesterfield was monitoring, and continuing to monitor, Ms. Noakes's social media for expressions of viewpoints he disfavored.

65. Further, Defendant Chesterfield stated that he would pursue no disciplinary charges "at this time."

11

66.   Taken together, this notice functioned as a threat: if Ms. Noakes were to at any time express any political or social viewpoints Defendant Chesterfield or other TSA management did not like, he would move forward with discipline against her.

67.   To date, TSA has not made any steps to remedy the harassment Ms. Noakes suffered, nor has it instructed any of Ms. Noakes's non-white coworkers to take down the social media posts that both call Ms. Noakes a racist and a murderer and disclose her personal identifiable information.

68.   Many of the posts are still present on Facebook, Twitter, and the internet at large.

69.   TSA has also failed to take *any* steps to address Ms. Noakes's concern for her physical safety.

70.   Thankfully, Ms. Noakes has been on unpaid leave, including leave under the Family Medical Leave Act ("FMLA"), and therefore has not had to physically return to work.

71.   To date, TSA has taken no action whatsoever against Ms. Noakes's non-white harassers, even when those non-white harassers flagrantly violate TSA policy. For example, TSA refused to discipline one non-white harasser when she illegally brought a weapon into a secure area at MSY airport. In refusing to discipline this employee, TSA demonstrated it would not protect Ms. Noakes's physical safety and would not take action against non-white employees.

## TSA Retaliates Against Ms. Noakes

72.    Within the past 180 days, Ms. Noakes has been qualified for, and has applied for, three promotions. She has only heard back regarding one promotion, for Transportation Security Manager, for which she was denied on or about December 20, 2021. In that case, a non-white employee with no known history of any EEO complaints was chosen over her.

73.    Ms. Noakes heard from multiple TSA employees that TSA had predetermined to choose a non-white employee for that position.

74.    In denying Ms. Noakes for the TSM promotion, TSA improperly took into account Ms. Noakes's filing of an EEO complaint and the EEO's subsequent dismissal in addition to her race. Ms. Noakes was objectively qualified for the promotion. Had she not lodged the EEO complaint in this case, she would have been selected for the position.

75.    Further, once EEO dismissed Ms. Noakes's complaint of discrimination, TSA dismissed Ms. Noakes's internal harassment complaints and began auditing Ms. Noakes's hours in an apparent attempt to later, pretextually terminate her.

76.    Ms. Noakes is entitled to qualified leave under Family and Medical Leave Act ("FMLA"). TSA previously recognized Ms. Noakes's legitimate FMLA leave, noting that she was allowed 480 hours of FMLA leave in a calendar year.

77.    Non-white employees openly shared on Facebook that they abuse the FMLA system, including statements referring to themselves as a "FMLA queen." No action was taken against those non-white employees.

78.     Within weeks of threatening Ms. Noakes with social media monitoring and potential discipline, and as a result of its "audit," TSA inexplicably instructed Ms. Noakes that, although she had only used 80 of the 480 allowed hours of FMLA leave, she would not be allowed any further FMLA leave after February 17, 2022. TSA made this inexplicable decision in retaliation for Ms. Noakes's social media comments, her protected complaints against her coworkers, and her EEO complaint.

79.     On or around January 6, 2021, following the events at the U.S. Capitol in Washington D.C., several non-white employees posted negative remarks about those protesters. No action was taken against those non-white employees.

80.     When taken in context with TSA's protection of non-white employees that violate TSA policy, this provides further evidence of an anti-white racial motive to TSA's treatment of Ms. Noakes.

## Exhaustion of Administrative Remedies

81.     Ms. Noakes timely responded to TSA's failure to remedy the racial harassment that she suffered, by initiating contact with the Equal Employment Opportunity (EEO) Counselor for TSA on May 18, 2021.

82.     On June 17, 2021, attorneys for Ms. Noakes were notified by TSA of the conclusion of EEO counseling and of Ms. Noakes's right to file a formal complaint with EEO.

83.     Ms. Noakes timely filed a formal EEO complaint on July 1, 2021.

14

84. On November 4, 2021, EEO dismissed Ms. Noakes's complaint and issued her a notice of right to sue. The letter instructed Ms. Noakes that she had 90 days to file her complaint in federal district court.

85. On or around January 6, 2022, Ms. Noakes began the EEO formal complaint process with respect to her denial of promotions and premature loss of FMLA leave. At all relevant times, Ms. Noakes has timely exhausted her administrative remedies to the best of her ability.

## CAUSES OF ACTION
## COUNT I

### Unlawful Hostile Work Environment Based on Race in Violation of Title VII, against Defendant Mayorkas

86. Ms. Noakes incorporates by reference the above paragraphs.

87. Ms. Noakes is an employee at TSA, entitling her to rights under Title VII.

88. TSA is required to abide by Title VII's prohibition on race discrimination.

89. Unlawful discrimination based on race includes the creation of a severe or pervasive hostile work environment based on race.

90. TSA discriminated against Ms. Noakes on the basis of race by permitting a severe and pervasive hostile work environment based on race to persist in the workplace, specifically including TSA's refusal to prohibit Ms. Noakes's non-white colleagues from harassing her based on Ms. Noakes's race, and by further baselessly punishing Ms. Noakes subsequent to her colleagues' pretextual and retaliatory complaints against her, again based on Ms. Noakes's race.

15

91.     TSA further fostered and permitted a severe and pervasive hostile work environment based on race, as evidenced by: (1) refusing to discipline any of Ms. Noakes's non-white harassers because of their race (which only emboldened them to continue their campaign of harassment against Ms. Noakes); (2) refusing to investigate Ms. Noakes's chief harassers, who are non-white, because of their race; (3) violating TSA's own policies in bringing allegations against Ms. Noakes without any supporting documents eight months after the alleged misconduct; (4) violating TSA's own policies by failing to render a timely decision on any of the complaints at issue, in a way that caused psychological harm to Ms. Noakes; (5) lying to Ms. Noakes on or around March 1, 2021, when TSA certified that it had no further allegations against her when in fact it did, or fabricating an additional allegation, Allegation #2, upon receiving Ms. Noakes's response to the first allegation; (6) construing the First Amendment to protect non-white employees' harassment of Ms. Noakes's but not a white employee's expressions of political or social opinions; (7) monitoring Ms. Noakes's social media; and (8) threatening Ms. Noakes with additional disciplinary processes if she expresses a viewpoint disfavored by TSA. This is a non-exhaustive list of TSA demonstrating an anti-white bias.

92.     This hostile work environment is severe, pervasive, and ultimately prevents Ms. Noakes from succeeding at TSA in her position.

93.     This hostile work environment is so severe and pervasive that any reasonable employee in Ms. Noakes's position would feel the work environment was untenable and would resign to escape.

94. In fact, TSA has created and permitted this hostile work environment to continue specifically to pressure Ms. Noakes to resign.

95. TSA did not subject any non-white employee to the same treatment to which it subjected Ms. Noakes.

96. There is no legitimate nondiscriminatory reason for TSA's behavior.

97. Even if a legitimate nondiscriminatory reason exists, it is merely pretext for unlawful discrimination.

98. Ms. Noakes has suffered severe professional, economic, and psychological harm as a result of this discriminatory process orchestrated against her.

99. Ms. Noakes continues to work in a severe and pervasive hostile work environment based on her race. Ms. Noakes is afraid to go to work for fear of her physical safety and continues to suffer enormous reputational harm as a result of TSA's failure to remedy the defamatory harassment. Therefore, Ms. Noakes requests compensatory damages, declaratory relief in the form of a declaration stating that TSA unlawfully discriminated against her on the basis of her race, injunctive relief ordering the TSA to remedy the harassment Ms. Noakes suffered, and any other relief the Court deems just and proper.

## COUNT II

### Unlawful Retaliation Based on Prior Protected Complaints Under Title VII, against Defendant Mayorkas

100. Ms. Noakes incorporates by reference the above paragraphs.

101. Ms. Noakes engaged in protected activity when she filed an EEO Complaint and participated in the EEO process.

102. TSA subsequently subjected Ms. Noakes to adverse employment actions because of her EEO complaint by denying Ms. Noakes the promotion to the position of Transportation Security Manager for which she was objectively qualified, on or about December 20, 2021.

103. TSA also subjected Ms. Noakes to adverse employment actions based on her prior EEO complaint by auditing her hours, denying her FMLA leave to which she was entitled, dismissing Ms. Noakes's original harassment complaint, and baselessly investigating Ms. Noakes subsequent to the pretextual complaints of her colleagues.

104. TSA would not have taken any of these actions – and would have selected her promotion to the Transportation Securty Manager position but for her prior protected EEO complaint.

### COUNT III

**Race Discrimination in Violation of Title VII, against Defendant Mayorkas**

105. Ms. Noakes incorporates by reference the above paragraphs.

106. Ms. Noakes is an employee at TSA, entitling her to rights under Title VII.

107. TSA is required to abide by Title VII's prohibition on race discrimination.

108. TSA discriminated against Ms. Noakes on the basis of race by granting preferential treatment to her non-white harassers throughout the investigations and adjudications of their claims, and manifesting prejudice against Ms. Noakes as a white employee throughout the same.

18

109.   TSA exhibited anti-white bias against Ms. Noakes by (1) refusing to discipline any of Ms. Noakes's non-white harassers; (2) refusing to investigate Ms. Noakes's chief harassers, who are non-white; (3) violating TSA's own policies in bringing allegations against Ms. Noakes without any supporting documents eight months after the supposed misconduct; (4) violating TSA's own policies by failing to render a timely decision on any of the complaints at issue, in a way that caused psychological harm to Ms. Noakes; (5) lying to Ms. Noakes on or around March 1, 2021, when it certified that it had no further allegations when in fact it did, or fabricating an additional allegation, Allegation #2, upon receiving Ms. Noakes's response to the first allegation; (6) construing the First Amendment to protect non-white employees' harassment of Ms. Noakes's but not a white employee's expressions of political or social opinions; (7) monitoring Ms. Noakes's social media; and (8) threatening Ms. Noakes with additional disciplinary processes if she expresses a viewpoint disfavored by TSA. This is a non-exhaustive list of TSA demonstrating an anti-white bias.

110.   Ms. Noakes is protected by Title VII from discrimination on the basis of her race.

111.   Ms. Noakes was qualified for her position at TSA and the promotions for which she applied as evidenced by her status as a STSO.

112.   Ms. Noakes suffered adverse employment actions, including but not limited to: (1) TSA has repeatedly failed to remedy the harassment that she suffered and continues to suffer; (2) Ms. Noakes has been subjected to constant fear that her employers will discipline her if she expresses any political or social opinion with

19

which TSA would disapprove; (3) Ms. Noakes has been denied multiple promotions for which she was qualified; and (4) Ms. Noakes was prematurely deprived of her allotted FMLA leave.

113. TSA did not subject any non-white employee to the same treatment to which it subjected Ms. Noakes.

114. There is no legitimate nondiscriminatory reason for TSA's behavior.

115. Even if a legitimate nondiscriminatory reason exists, it is merely pretext for unlawful discrimination.

116. Ms. Noakes has suffered severe professional, economic, and psychological harm as a result of this discriminatory process orchestrated against her.

117. Ms. Noakes is fearful to go to work due to concerns of her physical safety and continues to suffer enormous reputational harm as a result of TSA's failure to remedy the defamatory harassment. Therefore, Ms. Noakes requests compensatory damages, declaratory relief in the form of a declaration stating that TSA unlawfully discriminated against her on the basis of her race, injunctive relief ordering the TSA to remedy the harassment Ms. Noakes suffered, and any other relief the Court deems just and proper.

## COUNT IV

### Unlawful Retaliation Based on Protected Political Speech under the First Amendment against Defendant Chesterfield[1]

118.    Ms. Noakes incorporates by reference the above paragraphs.

119.    Defendant Chesterfield is an employee of TSA, which is an agency of the federal government. As such, when acting in the course and scope of his duties, he is bound by the First Amendment's prohibition on content-based restrictions of freedom of speech.

120.    All relevant TSA employees and agents are trained in First Amendment limitations on discipline.

121.    Ms. Noakes's speech criticizing the riots in London was not related to her federal employment and was thus made as a private citizen.

122.    TSA's initial commencement of disciplinary action against Ms. Noakes, through Defendant Chesterfield's subordinate, Mutavdzic, as well as Defendant Chesterfield's threat against Ms. Noakes that TSA is monitoring her social media accounts, would deter a reasonable person of ordinary firmness from continuing to engage in that speech.

---

[1] Presently, Ms. Noakes only requests declaratory and injunctive relief against Defendant Chesterfield in his official capacity. The issue of whether a person may sue a government employee in his *individual* capacity for money damages for First Amendment retaliation under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971)*,* is currently certified for appeal and pending before the United States Supreme Court. See *Egbert v. Boule.*, No. 21-147 (S. Ct., filed July 30, 2021). Oral argument is scheduled for March 2, 2022. To the extent the Supreme Court holds that a *Bivens* action exists against a federal employee for First Amendment retaliation, Ms. Noakes respectfully reserves the right to amend her complaint to assert that cause of action against Defendant Chesterfield in his individual capacity to seek money damages, including punitive damages, in addition to declaratory and injunctive relief.

123. Defendant Chesterfield deliberately took this action against Ms. Noakes because he disapproved of Ms. Noakes's opinion expressed in her speech. Ms. Noakes respectfully requests injunctive and declaratory relief in the form of an injunction prohibiting Defendant Chesterfield from engaging in content-based restrictions on speech as to her private social media account as well as a declaration that Defendant Chesterfield engaged in prohibited content-based restrictions on Ms. Noakes's free speech when he initiated disciplinary proceedings and threatened her with additional proceedings if she were to express a similar viewpoint.

## JURY DEMAND

124. Ms. Noakes demands a trial by jury on all issues triable by jury.

## PRAYER FOR RELIEF

125. Ms. Noakes requests this Court assume jurisdiction and grant the following relief:

a. A trial by jury on all issues triable by jury;

b. Compensatory damages in an amount to be determined at trial pursuant to plaintiff's claims against Defendant Mayorkas under Title VII;

c. Declaratory and injunctive relief pursuant to plaintiff's claims against all defendants under Title VII and the First Amendment of the United States Constitution;

d. Reasonable attorneys' fees with respect to all of plaintiff's causes of action against all defendants, whether authorized under Title VII, First Amendment jurisprudence, 28 U.S.C. § 2412(b), or otherwise; and

e.  Any other relief the Court deems proper.

Dated: January 31, 2022                                    DANA NOAKES,
                                                          By Counsel

Respectfully submitted,


/s/ Rachel T. Vogeltanz
Rachel T. Vogeltanz (Louisiana Bar No. 33501)
THE LAW OFFICE OF RACHEL THYRE VOGELTANZ, LLC
428 W. 21st Avenue
Covington, Louisiana 70433
Email: rachel@rachel.law
Telephone (985) 377-9271
Fax: (985) 302-0972

Lindsay R. McKasson (*pro hac vice forthcoming*)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Email: lindsay@binnall.com
Telephone: (703) 888-1943
Fax: (703) 888-1930

*Counsel for Plaintiff Dana Noakes*

23